## Kerr *et al. versus* Trego *et al.*

*Proper mode of organizing the Common Council of Philadelphia.—Authority of courts to annul wrongful organization and restrain wrong by injunction.*

1. The courts of Pennsylvania have authority, under the Constitution, to redress any wrong that may be committed within the proper territorial limits by any body of men, except only the supreme legislature of the state.

2. The remedy by injunction extends to all acts that are contrary to law and prejudicial to the interests of the community, and for which there is no adequate remedy at law.

3. Either of two conflicting bodies of men, claiming to hold one and the same office, at one and the same time, may apply to the court for an injunction to restrain the other from the usurpation of powers to which they are not legally entitled. In case of public corporations, the action of the attorney-general is necessary for the institution of proceedings for this purpose.

4. In all bodies that are under law, where there has been an authorized election for the office in controversy, the certificate of election which is sanctioned by law or usage, is the *primâ facie* written title to the office, and can only be set aside by a contest in the forms prescribed by law.

5. On the division of a body that ought to be a unit, the test for ascertaining which of them represents the legitimate social succession, is which of them has maintained the regular forms of organization according to the law and usages of the body, or (in the absence of these), in accordance with the laws, customs, and usages of similar bodies in analogous cases.

6. Where an ordinance of the Common Council of Philadelphia provided that the clerk and assistant clerk elect should continue in office until the organization of the new council and until their successors should be duly elected; and it appeared that at the organization of the new council there were present twenty-three members whose term had yet one year to run, among whom was the president of the preceding year; that the said president and clerks were in their usual places on the day and at the hour appointed by law for the organization of the new council: *Held*, that it was the right of said officers to organize the council by first calling the roll of the members whose term of office had not expired, and then requiring the new members to present their certificates that their names might also be enrolled; and that any interference with this mode of organization was irregular and improper. The right of members to seats in council must be ascertained in the manner prescribed by law.

IN the Supreme Court of Pennsylvania.

This was a proceeding founded on a bill filed by Wilson Kerr and others against Samuel Cavin, Charles B. Trego, and others, with a prayer for a special injunction.

The bill set forth that certain acts were passed by the General Assembly, approved respectively on the 2d February 1854, 21st April 1855, 13th May 1856, 30th March 1858, and 25th March 1861, creating and establishing the Select and Common Councils of ·the city of Philadelphia, imposing upon them certain duties, and conferring on them certain powers relative to the government of the said city, and directing the time, place, and mode of their organization.

"That complainants have been since the first Monday of January, A. D. 1862, members of the Common Council of the said city of Philadelphia, duly elected for their respective wards in the manner authorized and required by the said Acts of Assembly, and that their terms of office will not expire until the month of January in the year 1864. And that Wilson Kerr was duly elected president of the said body on the first Monday of January 1862, and has since acted as such.

"That in accordance with the provisions of the Act of March 25th 1861, there are certain members of the said council, twenty-three in number (naming them), whose terms of office did not expire on the first Monday of January 1863, and will not expire until January 1864. That it became and was the duty of the said continuing members of the said council to receive at the City Hall, in Philadelphia, on the first Monday of January 1863, the new members thereof (who had been duly elected in their respective wards), with a view to the due organization of the Common Council; and for that purpose, complainants, together with Philip H. Lutts, the clerk, and Isaiah H. Butler, the assistant clerk of said council, who were duly elected, and who acted as such during the preceding year (the said Wilson Kerr acting as president), met at the time and place appointed by law, and then and there admitted and received certain members of the said council, who then and there presented themselves for that purpose, and who had been duly elected as such at the last general election held in the city of Philadelphia, and with the said newly-elected members of the said council, composing a quorum of the whole body, duly organized the said body as the Common Council of the city of Philadelphia."

A copy of the minutes of said council was appended, and made part of the bill.

"That although it was the right and the duty of the continuing members of the said council to receive the newly-elected members, and although complainants constitute a majority of the said continuing members, and although the said president and clerk and assistant clerk of the said body were so elected, and acted duly and legally, and according to precedent and usage in all similar cases, yet so it is, that ten of the said defendants, to wit, the respondents, improperly and illegally acting in concert with the others, by a pre-arranged plan, did, at the hour and place appointed by law for assembling the said body, and while the said Wilson Kerr was in the chair, and duly acting as president, and while the other complainants were duly assembled to receive the newly-elected members of the said council, clamorously and illegally interfere with the proceedings of complainants composing the said Common Council, and did by disorderly and violent outcries proclaim Charles B. Trego, one of the defend-

[Kerr *et al. v.* Trego *et al.*]

ants, president of themselves, and George F. Gordon and Abraham Stewart clerks of their meeting or assembly, and did attempt to, and did interrupt the regular and orderly transaction of the business of the said Common Council, and by such conduct did endeavour to prevent complainants from duly acting in the matter of deciding upon the qualifications of persons claiming to be members of said Common Council, and of considering and deciding upon the claims of certain contestants to seats therein. And at the next stated meeting of complainants, the said defendants (with two exceptions) did again in a disorderly manner intrude into the council chamber and continue to act as and call themselves the Common Council of said city, and as such intended and intend to pass laws and ordinances for the government of the said city. And the said defendants threaten and intend to continue to intrude into the said Common Council chamber during the stated sessions of complainants, and to interfere with and prevent the orderly and lawful transaction of the public business.

"That the defendants threaten and intend, in pursuance of their said usurped and illegal action, to pass resolutions and ordinances appropriating the public moneys of the city, and to direct and permit their said clerk to draw orders upon the said city treasurer and present such orders to the said city controller for allowance and payment out of the city treasury.

"That the acts, matters, and doings in this bill, objected against the said defendants, are remediless at law, and will produce irreparable mischief unless restrained and prevented by your Honours: To which was added the usual prayer for a *subpœna*, a decree requiring answers, and a perpetual injunction against defendants, restraining them from the acts complained of."

A *subpœna* was thereupon awarded. No formal answer was filed, but affidavits affirming and denying the statements contained in the bill were presented by the parties to the court, which sat *in banc* on the hearing of the cause.

The main defence was, that, in consequence of frauds in the election of certain of the members of council recognised by the complainants, the Kerr branch of the Common Council had not a quorum of members, and were therefore without power to elect officers or transact any business whatever. That Mr. Kerr had no authority to call council together, and that the printed list of members prepared by the clerk, containing as it did the names of at least two persons who were not legally elected, showed an intention to admit them as members of council.

The case was argued by *William A. Porter* and *G. M. Wharton*, for complainants, and by Messrs. *Sellers, Gibbons,* and *Gilpin*, for respondents.

[Kerr *et al. v.* Trego *et al.*]

The opinion of the court was delivered, January 26th 1864, by Lowrie, C. J.—On account of the immense importance of this case to the city of Philadelphia, we all consented to sit together at the hearing of this motion for a preliminary injunction, hoping that we might thus bring to a speedy termination this very unpleasant difficulty. We have heard and carefully considered the case, and now proceed to pronounce the judgment of the law upon it, without expressing any opinion upon the merits or demerits of any of the parties to it, beyond what is necessary to the decision of the very point of the controversy. We shall neither approve nor disapprove here what we have no authority to judge.

Some objections were made to some of the minor details of the bill, but we say nothing about them, for they may be amended at any time, and it is sufficient, on this motion, that the main features of the case are so fully set forth in the bill and affidavit as to justify the motion. It is clearly alleged and shown that there are two bodies which claim to be regularly organized as the Common Council of the city, and each is proceeding to act as such, to the great detriment of the public interests. This is the wrong that is to be remedied. One or the other party must be wrong: they cannot both be regular.

1. Have the courts authority to redress this wrong? We think they have. All bodies, except the supreme legislature, are *under law*, and, therefore for all transgression of law, are subject to the authority of the judicial power established by the constitution. The corporation itself is subject to this authority, in so far as its acts are directed by law; though it is not, and cannot be so in so far as it is itself a law-making power. In so far as its judgment and direction are uncontrolled by the law of the land, it is free from the control of the courts; but in so far as its acts are directed by law, it is subject to the judicial authority. Much more, then, are all its officers subject to this authority, and especially those that pretend to act as its officers without right, and as there cannot be two common councils, one of these bodies must be a mere pretender to the right to act as such.

2. May the wrongful body be restrained from acting by means of the equity remedy of injunction? We think it may. This remedy extends to all acts that are contrary to law, and prejudicial to the interests of the community, and for which there is no adequate remedy at law; and we can hardly imagine any act that more clearly falls within this description than one that casts so deep a shade of doubt and confusion on the public affairs of a city as this does. In such a case, no remedy is adequate that is not prompt and speedy, and we know of no other remedy that is so prompt and speedy as this one. If a private partnership or corporation were to fall into a similar confusion, affecting all its members and all its creditors, we can think of no better remedy

[Kerr *et al. v.* Trego *et al.*]

than this for staying the confusion that would be caused by two opposite parties pretending to act as the society. It is the very remedy usually adopted when churches divide into parties, and we applied it in three such cases in the last year. Therein we decided directly on rights of *property*, because that became the aim of dispute. Here we must decide on the right to public *functions*, because that is here the purpose of the dispute. The main question in all such cases is regularity of organization, and the right to functions and property is a mere consequence of this.

3. May one of the conflicting bodies, or the members of it, maintain this action against the other? We think they may. This could not be doubted in relation to private corporations and partnerships. But it is argued that, in relation to public corporations, the attorney-general alone can file such a bill. We do not think so. It is right for those to whom public functions are intrusted, to see that they are not usurped by others. Either of these bodies has the right to demand of the courts that it and the interests of the public alleged to be committed to it, shall be protected against the usurpation of the other. We decided a similar principle in Mott *v.* The Railroad, 6 Casey 9, and we need say no more about it now.

This case is therefore regularly before us, and we proceed to the consideration of it, premising that there is no material fact in dispute, and that we have no authority to decide directly upon the validity of the election of any one of the claiming members.

4. In all cases of this kind, at least in all bodies that are *under law*, the law is, that where there has been an authorized election for the office in controversy, the certificate of election, which is sanctioned by law or usage, is the *primâ facie* written title to the office, and can be set aside only by a contest in the forms prescribed by law. This is not now disputed.

No doubt this gives great power to dishonest election officers, but we know no remedy for this but by the choice of honest men. When party fealty is a higher qualification than honesty or competence, we must expect fraud and force to rule, and a man must be an Ajax or a Ulysses to be qualified for office.

5. On the division of a body that ought to be a unit, the test of which represents the legitimate, social succession is, which of them has maintained the regular forms of organization according to the laws and usages of the body, or, in the absence of these, according to the laws, customs, and usages of similar bodies in like cases, or in analogy to them. This is the uniform rule in such cases. It is always applied in the case of church divisions, and was so applied by us three times last year in the church cases already alluded to. The courts can never apply it to divisions in the supreme legislature, because that body is subject to no judicial authority, and cannot be. They, too, ought to

[Kerr *et al. v.* Trego *et al.*]

adhere to this rule, for order and regularity are always worthy of respect, and especially so in cases where there is no authority that can enforce their claims. But we need not dwell on this point, for it is admitted that this rule is the test of legitimate organization.

6. Judged by this rule, was the Kerr body legitimately organized? We think it was. The undisputed facts are that there were twenty-three members, including the president last elected, whose terms had yet a year to run; that the clerk and assistant clerk were still in office, having been elected under a yet existing ordinance of 5th May 1855, § 6, that declares that they shall continue in office until the organization of a new Common Council, and until their successors shall be duly elected; that on the day, and at the hour appointed by law for the organization of the new council for this year, the president and clerks elected last year were in their usual places, and then and there proceeded first to call the roll of all the members whose terms of office had not yet expired, and then to call on the new members to present their certificates of election that their names might be enrolled. It seems strange to us that any one should doubt the strict regularity of this proceeding.

It has the sanction of the common usage of every public body into which only a portion of new members is annually infused. It is the periodical form of reorganizing the Select Council and the Senate of the state, and also the form of organizing the Senate of the United States on the meeting of a new Congress, when the vice-president does not appear, and the last president *pro tem.* does; and we understand this custom to be uniform throughout the United States, though this is not very important.

And when there is a president whose term as a member has not expired, then the functions of the clerks continue, and they, in all cases, act as the organs of reorganizing the body, and continue to hold office until their successors are chosen and qualified. Our state and federal houses of representatives are illustration enough of this. So universal is this mode of organizing all sorts of legislative and municipal bodies, that all departures from it can be justified only as founded on special and peculiar usages or on positive legislation. Whenever this form is adhered to, a schism of the body becomes impossible, though the process of complete organization may be very tardy. This council has existed only one year in its present form, and therefore is without any binding usage of its own on this matter.

In all cases where part of the public body remains, and is to be completed by the reception of new members, it remains as an organized nucleus, and in its organized form it receives the new members, and then proceeds to the election of new officers, if any are then to be elected. The old nucleus is not dissolved by

[Kerr *et al. v.* Trego *et al.*]

the incoming elements, but these are added to it, and then the whole body proceeds to the exercise of all its functions.

7. It is objected that a rule that attributes so much power to the officers of the previous year, gives them an advantage which they may use arbitrarily and fraudulently against the new members, so as to secure to themselves an illegitimate majority. No doubt this may be so; but no law can guard against such frauds so as to entirely prevent them, just as it cannot entirely prevent stealing and perjury and bribery. The people are liable to such frauds at every step in the processes of an election or organization. But so much the more need for order and law in this part of the process. The law *can* dictate that, though it cannot furnish honesty and sound judgment to the actors in it. That the law and order which we have announced has existed so long and so generally, is proof at least that it is better than no law at all.

8. Was the Trego body regularly organized? Because both cannot be regular, and the other is; this of course cannot be so. But the fact appears clearly and positively that it was not regularly organized. As the regular officer was proceeding to organize, some one moved, with a loud voice, that Isaac Sulger should act as clerk, and the same voice put the vote, and it was carried by those who liked the motion, and Isaac Sulger proceeded, as temporary clerk, to organize the party to which he belonged—all the other members treating this proceeding as disorderly. And so it was: and in such matters the race is not to the swift nor the battle to the strong or loud-voiced, but to the orderly. The proceeding was opposed to their own written law with regard to the clerks, and to common usage otherwise, as we have already explained.

This is so much like the disorders that occurred in the House of Representatives in 1838, and that produced a dangerous schism there that lasted several weeks, that it hardly needs an opinion from us to condemn it. The disorderly body in that case was dissolved by the force of public opinion, and the members returned and took their places in the regular body, which, by their own fault, they had no hand in organizing. We allude to the merits of that case only in so far as they relate to the *order of the proceeding*, which is the point here.

9. It is objected that the plaintiffs have no equity to support this motion, because, as defendants believe, they intended to use their power fraudulently, so as to admit persons not elected, and to exclude some that were; and the principal evidence of this purpose is, that the clerk had procured printed slips containing a list of all the members, including the disputed members of the Kerr side, and excluding one on the other side, who had been, it is said, wrongfully removed. We cannot say that all this is a bar to the motion; for the right to it does not depend upon the

merits of the nominal parties to this suit, but on the right of the public to have their regular organization protected, so that public business may proceed with security and certainty. Moreover, we cannot condemn the course of the clerk. We suppose it is not unusual for the clerk to prepare such lists for such an occasion; and we cannot say that there was any fraud in them, without deciding upon the election of some of the members, which is beyond our authority in this proceeding.

Possibly the result of this view of the law will be that the Kerr body will make an unfair use of their power in the reception of the other members, as it has been suggested, for each party charges the other with having admitted members that were not duly elected, and the learned counsel here have not denied this. But we know of no cure for this but by the improvement of our human nature; this court cannot prevent it without an unauthorized interference with, and direction of, the organization of the body. We must trust them where the law trusts them. We declare which body has proceeded in regular form, and having done so, we may not say how it shall act afterwards. It has a law directing that. We need not even say how far the act of organization has proceeded: it was regularly commenced and carried on, and no irregular body can be allowed to interfere with it at any stage of its work.

And we can see no propriety in our interfering to save those who have initiated an abortive revolution from the temporary loss of power, which may possibly result from their defeat. It may be that they have passed the time for contesting disputed seats, but we cannot help that; we did not make their election law, and, we cannot alter it, and equity can hear no one who alleges his own wrong as a ground of relief. And it is not possible for us to impose terms wisely without trying ourselves all the disputed seats, which, as we have said, we cannot do. If there was before us a yet undetermined question, the determination of which might change the result and restore the other party, we would impose terms for speeding the trial of that question, as we did last fall in the sheriff's case. But there is no such question in reserve here. The efficiency of our action is in the declaration that the Trego organization is without right, and the granting of the injunction is little more than the form of putting this declaration on the record. .

The preliminary injunction is granted as prayed for.